In the Matter of Samuel A. MORENO, Debtor.

Samuel A. MORENO, Appellant,

v.

Michael ASHWORTH, Appellee.

No. 89–1202.

United States Court of Appeals, Fifth Circuit.

Jan. 22, 1990.

Michael Cooper, Dallas, Tex., for appellant.

E.P. Keiffer, Dallas, Tex., for appellee.

Before GOLDBERG, POLITZ, and JONES, Circuit Judges.

EDITH H. JONES, Circuit Judge:

The district court affirmed a judgment of the bankruptcy court, which held that a significant debt owed by Samuel A. Moreno was non-dischargeable, 11 U.S.C. § 523(a)(4), and that Moreno could not re-ceive a discharge in bankruptcy because he had attempted to conceal property from his creditors. 11 U.S.C. § 727(a)(2)(A). 102 B.R. 65. We affirm the lower courts' judgment on the dischargeability of the debt owed by Moreno to Petroleum Energy Equipment Company (PEEC), but we reverse the judgment denying him a discharge.

Moreno was the president of Petroleum Energy Equipment Corporation ("PEEC"), a company which filed a Chapter 11 petition in May, 1983. Ashworth, the appellee, was appointed PEEC's trustee a few months later. One of Ashworth's responsibilities was to recover receivables owed to PEEC. From the company's books, Ashworth learned that Moreno owed at least $47,000 from personal corporate advances, while several other entities, apparently connected to Moreno, owed PEEC over $150,-000.

Moreno himself filed a Chapter 7 bankruptcy petition in May, 1985. A few months later, an adversary proceeding objecting to his discharge was commenced. The bankruptcy court consolidated this adversary proceeding with the PEEC trustee's complaint to determine dischargeability of debt, related to Moreno's and his affiliated entities' transfers from PEEC, and both cases were tried in November, 1986. Nearly 18 months later, the court issued its findings and conclusions and rendered judgment for the trustee. We shall discuss the objection to discharge and the dischargeability claims separately.

## I.

### DENIAL OF DISCHARGE

█ Within three months before he filed his Chapter 7 petition, Moreno contracted to receive $50,000 in cash and a five-year Consulting Agreement in connection with the sale of a company (TMG) in which he was the major shareholder and an active executive. Moreno lost most of the $50,000 payment immediately, because the PEEC trustee obtained a temporary restraining order subjecting it to a judgment against

Moreno obtained in the PEEC bankruptcy.[1] Moreno's trustee contends, and the district and bankruptcy courts found, that Moreno intended to hinder, defraud or delay his creditors by accepting the remainder of the consideration in a consulting agreement, whose payments he could argue were wages exempt from creditors' claims under Texas law.

The relevant bankruptcy law provision requires the court to grant a discharge unless "... the debtor, with intent to hinder, delay, or defraud a creditor ... has concealed ... property of the debtor, within one year before the date of the filing of the petition...." 11 U.S.C. § 727(a)(2)(A). We have held that a debtor's discharge can be denied only if his conversion of property nonexempt from creditors into an exempt status is accompanied by an actual intent to defraud creditors. *In re Reed,* 700 F.2d 986, 991 (5th Cir.1983).[2] Further, the courts' fact finding of an actual intent to defraud creditors must be upheld unless it is clearly erroneous. *In re Reed, supra* at 992. Having carefully reviewed the trial transcript, we are left with the definite and firm conviction that the trial court and district court erred. *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948).

Describing the transaction for the sale of Moreno's and his wife's stock in TMG is necessary to demonstrate the lower courts' error. Moreno owned two-thirds of the stock in TMG as of December 31, 1984. Four other shareholders, including three venture capital investors, also held over $1/2 million in TMG subordinated debentures. Moreno and his wife had guaranteed the debts owed to the venture capital shareholders, to Allied Bank, and to former owners of a TMG subsidiary in a total amount exceeding $2 million.

Perry Equipment Corporation ("Perry") had recently become interested in acquiring TMG, to obtain the assets of its subsidiary H–R Industries, Inc. Although H–R Industries, Inc., a manufacturer of printed circuit boards for the telecommunications industry, occupied a certain market niche in Dallas, its financial condition was precarious at the end of 1984. An August fire seriously damaged its production facility, and the company's order backlog consequently vanished.

Perry apparently saw an opportunity to acquire H–R, through purchase of TMG, in its hour of need for a bargain basement price. Both Claude Durkey, Perry's financial vice president, and Paul Dickinson, the chief financial officer of TMG and H–R, testified that in their view the TMG stock had no equity value when Perry acquired it. This is reflected in the final terms of sale. Perry purchased TMG for $99,000 cash, distributed among the shareholders, plus a restructuring of TMG's outstanding debt and an infusion of cash to TMG.[3]

From Moreno's perspective, the sale offered $50,000 cash, considerably less on a per-share basis ($.38) than the venture capital shareholders were receiving ($1.00)— but Moreno was not in the dual position of a creditor of the company. The minority shareholders were presumably being compensated for their participation in debt restructuring as well as for their equity interest. Moreno insisted upon and received releases of his and his wife's obligations as guarantors.

Moreno also received a five-year Consulting Agreement, which required him to be available to the company from two to ten hours weekly and included a non-competition agreement. Pursuant to the Consulting Agreement, Moreno would receive

---

1. This judgment was based on the $47,000 that PEEC's books showed as a receivable owed by Moreno personally.

2. "For example, evidence that the debtor, on the eve of bankruptcy, borrowed money that was then converted into exempt assets would suffice to support a finding of actual intent to defraud. Only if such a finding is made may a discharge be denied." *In re Reed,* 700 F.2d at 991.

3. Paul Dickinson testified, by contrast, that it would have cost about $3 million to reproduce the company's hardware and technological expertise. Perry eventually contributed over $800,000 to restructure H–R's outstanding debt and furnish working capital and over $250,000 to buy new equipment.

$4,166.67 each month. In ambiguous language, the Consulting Agreement appeared to provide that if Moreno predeceased his wife, she could receive up to one-half of the monthly payments otherwise owed to him. Moreno subsequently did consult with the company as needed, and he received monthly payments for less than a year after the sale.

The precise reasons for the bankruptcy court's finding that the stock sale and Consulting Agreement were made with actual intent to defraud Moreno's creditors are unclear. The bankruptcy court added four wholly conclusionary sentences to 36 stipulations of fact entered by the parties before trial started. The stipulations described the various parties' relations and the nature of the Perry transaction. The court referred to none of the trial testimony concerning the transaction, nor did it make explicit credibility determinations. In affirming the bankruptcy court, the district court made a few terse observations about the possible postmortem payments to Moreno's wife from the Consulting Agreement, Moreno's failure to independently notify or offer the consideration from the sale to PEEC's trustee, and his failure to acknowledge an ownership interest in TMG to PEEC's trustee over a year before the stock sale occurred. These points pale in significance, however, to the point of clear error, when compared to the actual, complex structure of the Perry acquisition and Moreno's impotence in directing or structuring it.

For four reasons, based on facts not disputed at trial and not even referred to by the lower courts, the sale of Moreno's interest in TMG stands apart from the usual type of transfer intended to defraud creditors. Compare note 2, *supra*. First, the Consulting Agreement was not contrived or forced upon Perry by Moreno: it was part of Perry's standard terms when acquiring a closely-held company. Perry's financial officer testified that the agreement and its terms were probably a carbon-

copy of another deal previously transacted by Perry, and it had a bona fide business purpose.

Second, the sale was part of an arms-length, multi-party transaction in which Moreno had little if any negotiating leverage. TMG was not a healthy company. It needed cash badly. It is simply unrealistic to imply, as does the Trustee, that Moreno could have received a higher consideration for his stock up-front rather than by a consulting agreement. Perry offered only $99,000 for all of the stock of TMG, and Perry apparently determined how it should be divided among the shareholders. Moreno's only hope was to obtain a deferred payment package that would be realized upon if the company survived.[4] The Trustee also suggests that because Moreno's payments from the consulting agreement might be exempt from garnishment in Texas as wages, he had every incentive to encourage this arrangement. There is no evidence that he did so, however. In fact, Moreno, Paul Dickinson and Durkey all testified that such considerations were never discussed. Moreno and Dickinson thought that wages were subject to garnishment.

Third, although Moreno did not advertise the stock sale to his creditors, neither did he affirmatively conceal it. His company made full disclosure to Perry about its potential liability to the PEEC trustee, and PEEC's trustee protected his interest with settlement agreements and a temporary restraining order on Moreno's share of cash arising from the sale.

Fourth, the sale enabled Moreno to obtain releases from nearly $2 million in guarantees of debt owed by TMG to its minority shareholders, Allied Bank and former owners of H–R. This aspect of the sale benefitted Moreno's creditors by eliminating claims that would otherwise have been entitled to share pro rata in the distribution of his bankruptcy estate.[5]

We are led to the inescapable conclusion that Moreno did not actually intend to hin-

---

4. When this case was tried, H–R remained in serious financial condition.

5. Although the trustee sought to belittle the value of these guarantees at trial, because Moreno

was in parlous personal financial condition when he sold his TMG stock, no evidence suggests that the holders of the guarantees would not have filed proofs of claim on them in More-

der, delay or defraud creditors in the sale of his TMG stock or receipt of a consulting agreement. Both the transaction and its structure were dictated by economic factors—including the positions of minority shareholders and Perry—over which Moreno had no control. PEEC's trustee became closely involved in the final negotiations and even delivered a release to Perry after receiving money or notes from H–R, Dickinson and Moreno.

Moreover, to hold that Moreno's acceptance of a consulting agreement in these circumstances bespeaks an actual fraudulent intent toward his creditors is unwise from a policy standpoint. Had Moreno not accepted the agreement, it is unlikely he could have received any more cash from the sale of TMG stock, because TMG was a failing company without Perry's assistance. The acquisition was a salvage operation by Perry. The consulting agreement offered Moreno the opportunity to help H–R turn around, to profit from its good fortune, and to make ends meet while he was getting into another business. Such events could in the long run help to pay off Moreno's other creditors. From the creditors' standpoint, Moreno could receive little if anything more from Perry if he refused the consulting agreement, but at least they had a possibility of payment if he accepted it.

## II.

### THE NON–DISCHARGEABILITY OF CERTAIN DEBTS

■ The bankruptcy court found that Moreno had practiced fraud, embezzlement or defalcation in his fiduciary capacity as an officer of PEEC, rendering the amounts so owed a non-dischargeable debt. 11 U.S.C. § 523(a)(4). We need go no further than the test for defalcation in affirming this part of the judgment.

The evidence shows that while Moreno was an officer of PEEC, he directed the transfer of nearly $200,000 to himself and companies in which he owned a 50% or greater interest. As the courts found, no loan agreements, promissory notes, security agreements or interest were provided in connection with these advances. No portion of them was repaid. No corporate purpose of PEEC was furthered by the transfers. About $99,000 of the loans were initially booked by PEEC as advances for officers' salaries.

■ Whether the money served Moreno personally, as the bankruptcy court found, is significant but not necessarily determinative. A defalcation is a willful neglect of duty, even if not accompanied by fraud or embezzlement. *See* L. King, 3 Collier on Bankruptcy ¶ 523.14, at 523–93 to 523–95 (15th ed. 1988), quoting *Central Hanover Bank & Trust Co. v. Herbst*, 93 F.2d 510 (2d Cir.1937) (L. Hand, J.). Moreno does not dispute that he owed a fiduciary duty to PEEC because he was an officer. This duty encompassed, at least, a responsibility not to lend PEEC's money to himself or corporations controlled by him on less than an arms-length basis. *See generally Gearhart Industries, Inc. v. Smith International, Inc.*, 741 F.2d 707, 719 (5th Cir. 1984). *See also International Bankers Life Ins. Co. v. Holloway*, 368 S.W.2d 567 (Tex.1963). Further, although he denied responsibility for keeping the company's books in which the transactions were variously recorded, at different times, and of course denies liability, Moreno does not contest the actual amount of the judgment.[6] The lower courts' findings are not clearly erroneous.

For the foregoing reasons, the judgment of the district court is affirmed insofar as it declares certain debts of Moreno non-dischargeable, and is reversed to the extent it denied his discharge.

*AFFIRMED* in part, *REVERSED* in part.

no's later bankruptcy or that the amounts claimed would not have been a very large proportion of Moreno's total indebtedness.

**6.** Moreno's objections to the interest rates assessed on the amounts in judgment are without merit.