Paul L. MEDUS Jr. and
Rodney P. Medus

v.

Ernest R. PERRY Sr. and
Gayle G. Perry.

Civ. A. No. 94–0881.

United States District Court,
E.D. Louisiana.

Aug. 4, 1994.

Merrill T. Landwehr, Landwehr & Hoff, New Orleans, LA, for debtor/appellant Ernest R. Perry, Sr.

Sidney J. Angelle, Lobman, Carnahan & Batt, Metairie, LA, Jan M. Hayden, Bronfin & Heller, Michael G. Gaffney, Hurndon & Gaffney, New Orleans, LA, for plaintiffs/appellees and cross-appellants Paul L. Medus Jr. and Rodney P. Medus.

## MEMORANDUM OPINION

MENTZ, District Judge.

Defendant Ernest R. Perry Sr. appeals the Bankruptcy Court's judgment against him and in favor of plaintiffs as to plaintiffs' claim objecting to the dischargeability of a debt under 11 U.S.C. § 523(a)(4). Plaintiffs Paul L. Medus Jr. and Rodney Medus appeal the Bankruptcy Court's judgment dismissing their claims objecting to the dischargeability of a debt under 11 U.S.C. § 523(a)(2)(A). Having considered the briefs, the applicable law and the record, the Court affirms the judgment of the Bankruptcy Court in part and reverses the judgment of the Bankruptcy Court in part for the reasons that follow.

## BACKGROUND

Defendant and Debtor Ernest R. Perry Sr. (hereinafter "Perry")[1] was a pharmacist with a one-half ownership of stock in The Perry Company, Ltd., which offered franchises to operate discount drug stores under the name of Perry's Discount Pharmacy. (Transcript, Vol. 2, p. 77.) Perry was chief operating officer of The Perry Company, Ltd. (Exh. 1, p. 7), and the chief executive officer was Wayne A. Collier (hereinafter "Collier"). (Transcript, Vol. 2, p. 77.) Collier was the owner of the other fifty-percent of the stock in the franchisor. (Transcript, Vol. 2, p. 77.)

Paul L. Medus Jr. became interested in investing in a franchise in summer 1985, along with his brother Rodney Medus. (Transcript, Vol 1, p. 7.) Another brother, Robert Medus, did not invest in the franchise but testified that he allowed his two brothers to hypothecate property owned by the three brothers to obtain loans to invest in the franchise. (Transcript, Vol. 2, pp. 5–6.)

1. The Bankruptcy Court dismissed the claims objecting to discharge of Ernest Perry and his wife Gayle G. Perry under 11 U.S.C. § 727 and 11 U.S.C. § 523(a)(6) at the conclusion of the trial and took under advisement the plaintiffs' objections to discharge under 11 U.S.C. §§ 523(a)(2)(A) and 523(a)(4). (Transcript, Vol. 3, pp. 157–60; Document 32 of the Bankruptcy Court record.) The Bankruptcy Court stated in its Memorandum Opinion that "the Court effec-tively dismissed Gayle G. Perry as a defendant when it dismissed the § 727 claim because the evidence introduced at trial on the Section 523(a)(2)(A) and (a)(4) claims was against Ernest R. Perry." Memorandum Opinion, p. 1, n. 2. None of the parties appealed this portion of the decision. Therefore, any reference to "debtor," "defendant," or "Perry" in this opinion is a reference to Ernest R. Perry alone.

Paul Medus testified that after he became interested in the franchise, he met with Collier and Perry, but Perry only attended one meeting. (Transcript, Vol. 1, pp. 7, 9, 187.) Rodney Medus testified that Perry attended only one meeting prior to the Medus brothers' investing in the Corporation, at which time Perry told the brothers that if there were any questions, Collier would answer them. (Transcript, Vol. 2, pp. 12–13.) Rodney testified he met two or three times with Collier. (Transcript, Vol. 2, p. 39.)

The franchise was to be located at 4475 Perkins Road in Baton Rouge at a location debtor had leased in November 1984 from the Cangelosi family. Perry testified that he had leased the property, performed market surveys and intended to open a discount pharmacy there before the Medus brothers became interested in a franchise. (Transcript, Vol. 3, pp. 143–44.)

With Collier acting as notary public, Perkins at College, Inc. (hereinafter "Corporation"), was incorporated on August 23, 1985. (Exhibit P9.) The Initial Report of Stockholders of the Corporation shows that Paul Medus and Perry were the Corporation's two directors. (Exhibit P9; Transcript, Vol. 1, p. 23; Vol. 2, p. 148.) The minutes of the first meeting of the Corporation's board of directors show that Paul and Rodney Medus along with Perry were the stockholders and that Paul Medus was elected president and Perry secretary of the Corporation. (Exhibit P10.) The minutes also show that the Board authorized Paul Medus, as President, to enter into a sublease on behalf of the Corporation for the property that Perry had previously leased at 4475 Perkins Road. (Exhibit P10.) [2]

The Corporation also entered a franchise agreement with The Perry Company, Ltd., on August 23, 1985. (Exhibit P6.)

According to the evidence adduced at trial, Paul and Rodney Medus were to own 30% of the stock of the Corporation and Perry was to own 70%. (Exhibit P9.) The total capitalization of the Corporation was to be $700,000. (Exhibit P7; Transcript, Vol. 1, pp. 27–28.)

The Medus brothers and Perry were each to put up 10% of their share of the capitalization in cash and borrow the remaining 90%. (Exhibit P7.) Thus, the Medus brothers would put up $21,000 in cash and another $189,000 procured through a loan. (Transcript, Vol. 1, p. 31.) Perry was to invest $49,0000 in cash and $441,000 procured through a loan. (Transcript, Vol. 1, p. 31.)

The Medus brothers put up their cash and secured a loan from the First National Bank of Commerce for the remainder of their capitalization. (Transcript, Vol. 1, p. 32.) This was done by November 1, 1985, the date the store opened. (Transcript, Vol. 1, p. 38.)

Perry had not put up his total share of the capitalization by November 1, 1985. (Transcript, Vol. 1, pp. 39, 41, 51.) Perry had applied to First Eastern Bank and Trust for a loan of $441,000. However, that bank only lent Perry $264,000, secured with pledges or mortgages of Perry's own properties. (Transcript, Vol. 3, pp. 47, 143; Exhibit P73–G.)

As a result, he applied to Crescent City Bank for a loan of $180,000, which Perry testified that he thought was to be a personal loan in which he mortgaged 70 percent of the inventory that he considered he owned in the Baton Rouge store. (Transcript, Vol. 3, pp. 50–55.)

However, the documentary evidence indicates that the loan was a loan to the Corporation secured by the assets of the Corporation. A letter written to Ray C. Baas ("Bass"), president of Crescent City Bank, by Collier on December 6, 1985, indicates that the loan was to be secured by a collateral chattel mortgage on the furnishings, fixtures and equipment located at the Baton Rouge store. (Exhibit P69–A.) The letter further indicates a balance sheet of the Corporation would be provided in the future and included a copy of the lease and sublease of the property, the articles of incorporation of the Corporation, and a *pro forma* of operations of the Corporation. (Exhibit P69–A.)

---

**2.** Paul Medus testified that he never executed the sublease although he knew "rent was running." (Transcript, Vol. 1, pp. 98–99.) Plaintiffs' Exhib-

it P83 shows that Perry signed the sublease for the Corporation.

Collier sent another letter, dated December 12, 1985, to Walter Dabbs at Crescent City Bank, which letter forwarded drafts of a collateral chattel mortgage and collateral chattel mortgage note in the amount of $180,000 to be executed by the Corporation through Perry as its Secretary as well as a general resolution of the Corporation that authorized Perry, as Secretary, to buy property, to borrow money, and to execute notes, mortgages, and other documents on behalf of the Corporation. (Exhibit P69–D.) The draft of the corporate resolution indicates that it was adopted at a meeting of August 23, 1985, and was to be certified by Perry as Secretary. (Exhibit P69–D.) However, there is no certification or date for the certification. (Exhibit P69–D.)

Collier forwarded a third letter, this one again to Baas, on December 13, 1985, concerning other corporations in which Perry owned an interest. (Exhibit P69–C.) [3]

On January 6, 1986, Perry executed the following documents on behalf of the Corporation: a hand note in the amount of $180,000 to Crescent City Bank (Exhibit P69–H); a collateral chattel mortgage (Exhibit P69–E); a Crescent City Bank printed form of resolution (authorizing only Perry to sign checks and borrow money on behalf of the Corporation) (Exhibit P69–J); and a collateral pledge agreement. (Exhibit P69–G.) The maker, grantor and pledgor, respectively, of these documents was the Corporation, not Perry individually.

The Crescent City Bank printed form of resolution (Exhibit P69–J) gives authority to Perry to borrow on behalf of the Corporation and to alienate corporate assets. The document states that the resolution was passed at a board of directors' meeting held on August 29, 1985. (Exhibits P54 and P69–J.)

In addition to the Crescent Bank printed form of resolution, a specially prepared resolution of the Corporation was introduced at trial that states it was adopted on August 23, 1985. (Exhibit P69–F.) This resolution also gives Perry authority to borrow money on behalf of the Corporation and to alienate

Corporate assets; it is a signed copy of the draft of resolution prepared and submitted to Walter Dabbs by Collier in his December 12, 1985, letter. (Exhibit P69–D.)

Paul Medus testified that he did not recall any meeting being held on August 23, 1985, and that no meeting was held on August 29, 1985. (Transcript, Vol. 1, pp. 130–31.) Paul Medus further testified that he had seen draft copies of the August 23, 1985, minutes prior to the finalization of who were to be the incorporators of the Corporation. (Transcript, Vol. 1, p. 29).

Rodney Medus testified that no authority was given to Perry to encumber assets at the August 23, 1985, board of directors meeting. (Transcript, Vol. 2, p. 34.)

The copy of the minutes of the meeting of August 23, 1985, was introduced into evidence, although unsigned, without objection. (Exhibit 10.) As noted, the minutes show that regular organizational duties of the corporation were carried out by the two directors, Paul Medus and Perry. Paul was elected President and Perry Secretary. Paul was given authority to sign checks on behalf of the Corporation and execute the sublease for the property. The minutes are silent as to given authorization to any officer to alienate corporate property. (*See also* Testimony of Collier, Transcript, Vol. 2, p. 149.)

As noted, Perry testified that he intended the loan to be a personal loan encumbered by his ownership of the inventory at the Corporation's store. (Transcript, Vol. 3, pp. 52, 55.) Perry also testified that he and Baas called Paul Medus from the bank and told him Perry was going to pledge his share of the inventory. (Transcript, Vol. 3, pp. 52, 62–63, 65.) Perry testified that Paul said as long as neither he nor his brothers had to sign anything, the plan was fine with him. (Transcript, Vol. 3, pp. 62–63.)

Baas testified that he called Paul Medus from the bank with Perry present and a brief conversation occurred with Medus on the speaker phone about the $180,000 loan and

---

**3.** The letter stated that a corporate resolution and collateral mortgage, presumably of the Corporation, were enclosed, although these attachments were not introduced into evidence with the December 13 letter.

the fact that Perry was mortgaging the inventory of the store. (Transcript, Vol. 2, p. 45.) Baas stated that Paul Medus said he was aware of Perry's action and that the bank was not requiring him to sign the loan. (Transcript, Vol. 2, pp. 45–46.) Baas further testified that although Paul was not being asked to guarantee or endorse the loan, he made it a point to call Paul, whom he had known for years, to tell him about the loan to the Corporation. (Transcript, Vol. 2, pp. 45–46.)

Paul Medus testified he did not talk with Ray Baas at any time about the loan by Crescent City Bank. (Transcript, Vol. 1, pp. 185–86). He also testified that he was unaware in December 1985 that Perry was seeking a loan from Crescent City Bank and was unaware that Perry was seeking a loan on behalf of the Corporation. (Transcript, Vol. 1, p. 119.)

After the store opened, the Medus brothers had asked for financial statements for the Corporation, but they were slow in coming. (Transcript, Vol. 1, pp. 65–66.) In May or June 1986, they received financial statements for January and February 1986 which showed a note due and payable to Crescent City Bank. (Transcript, Vol. 1, pp. 74–75, 79; Vol. 2, pp. 17–18.) After they made repeated attempts to learn what this note was for (Transcript, Vol. 1, pp. 75, 82; Vol. 2, p. 18), the Medus brothers attended a meeting with Perry in October 1986 and inquired about the note. (Transcript, Vol. 1, pp. 87–94; Vol. 2, pp. 6–8.) They testified that Perry told them the note was a mistake. (Transcript, Vol. 1, p. 94; Vol. 2, pp. 18–19.) Paul and Robert Medus brothers further testified that Perry said the loan was supposed to be a personal loan, not a Corporate loan. (Transcript, Vol. 1, p. 94; Vol. 2, pp. 6–7.)

Approximately one year after the store opened, a fire occurred at the store. The Medus brothers learned of the fire through their aunt but were assured by Perry that there was no problem. (Transcript, Vol. 1, p. 48; Vol. 2, p. 24.) However, the brothers later drove to the store and learned the business was shut down and the manager was working with salvage representatives to verify the loss. (Transcript, Vol. 1, p. 108; Vol. 2, p. 25.)

After the fire, the Medus brothers tried unsuccessfully to get information about the Corporation. (Transcript, Vol. 1, p. 107; Vol. 1, pp. 25–26.) They attended one meeting in January 1987 with Collier and were informed that $52,000 had been received from the salvage company for fire-damaged merchandise. (Transcript, Vol. 1, p. 124; Vol. 2, p. 27.) Paul Medus then wrote to Perry to learn how that money had been disbursed. (Exhibit P36; Transcript, Vol. 1, p. 134.) Paul Medus also went to and wrote to Crescent City Bank to get copies of the loan documents. (Transcript, Vol. 1, pp. 127, 129–30.)

At another meeting in March 1987, this time with Perry attending, there was testimony that Collier told Perry that if the loan was supposed to be a personal loan and not a corporate loan, there was a problem. (Transcript, Vol. 1, p. 147; Vol. 2, p. 8.)

The Corporation's insurer, Continental Casualty Company ("CNA"), filed an action for declaratory judgment in United States District Court for the Middle District of Louisiana seeking to have the insurance policy annulled or the claim for the fire disallowed. (Transcript, Vol. 1, pp. 171–72; Exhibit P54–B.) CNA alleged in the lawsuit that the fire was set by or at the direction of Perry; that an increase in coverage from $400,000 to $1,000,000 shortly before the fire increased the moral hazard of fire in violation of the policy and state law; and that Crescent City Bank and Bake, Inc. (a corporation wholly owned by Perry) were contingent beneficiaries whose right to recover was barred by Perry's acts. CNA also alleged in the lawsuit that because Perry was without Corporate authority to execute the note and collateral chattel mortgage in favor of Crescent City Bank, the instruments were void and unenforceable and, thus, Crescent City Bank was without an insurable interest.

The Medus brothers, both individually and as minority shareholders of the Corporation, had filed a lawsuit in Civil District Court for the Parish of Orleans, State of Louisiana, against Perry, Collier, the Corporation and The Perry Company, Ltd., seeking appointment of a receiver for the Corporation, an

accounting, rescission of the sublease entered into by and between the Corporation and Perry, rescission of the franchise agreement, damages and injunctive relief. (Exhibit P54–A.)

CNA, the Medus brothers and other parties entered into a consent judgment in that matter on July 6, 1989, in the matter in federal court. (Exhibit P62.) According to that consent judgment, the lawsuit by CNA, another lawsuit by Trinity Universal Insurance Company of Kansas, Inc.,[4] and the state court lawsuit by the Medus brothers were dismissed. Further, all claims of CNA against the Corporation, Bake, Inc., and Crescent City Bank were dismissed; the counterclaims of all parties against CNA were also dismissed. Finally, judgment was granted in favor of the Medus Brothers against Perry for $160,000[5] and in favor of the Trinity Universal Insurance Company against the Corporation for $35,000. The parties also executed a settlement agreement in accord with the terms of the consent judgment. (Exhibit P63.)

On September 20, 1989, Perry and his wife filed a Chapter 7 proceeding. On December 27, 1989, the Medus brothers filed this adversary proceeding objecting to the dischargeability of Perry's debt pursuant to 11 U.S.C. § 523(a)(2)(A) and (a)(4). Following a three-day trial, the Bankruptcy Court issued a Memorandum Opinion with Findings of Facts and Conclusions of Law (Document 36 of the Bankruptcy Court record), ruling in favor of the Medus brothers on the § 523(a)(4) claim and in favor of Perry on the § 523(a)(2)(A) claim. The Bankruptcy Court then issued a judgment in accord with that opinion.

Perry appeals the judgment against him and in favor of the Medus brothers pursuant to 11 U.S.C. § 523(a)(4). The Medus brothers cross-appeal the judgment against them and in favor of Perry, dismissing their claim under 11 U.S.C. § 523(a)(2)(A).

4. Trinity Universal Insurance Company of Kansas, Inc., insured the building where the Corporation's store was located. (Exhibit P63.)

## ISSUES

1. Was the Bankruptcy Court's interpretation and application of the defalcation standard under 11 U.S.C. § 523(a)(4) erroneous?

2. Was the Bankruptcy Court's finding that Perry breached a fiduciary duty to the Corporation and its shareholders by encumbering assets to secure a loan contrary to the evidence presented at trial?

3. Did the Medus brothers sustain their burden of proof in showing any conduct of the debtor that amounted to the type of misconduct sufficient to constitute defalcation under 11 U.S.C. § 523(a)(4)?

4. Did the Medus brothers sustain their burden of proof in establishing the fact that Perry had aided and abetted in setting the fire at the Corporation's store, thus establishing an action under 11 U.S.C. § 523(a)(2)?

5. Did the Bankruptcy Court err in failing to decide the issue of whether Perry's actions in regard to the lease for the Corporation's store constituted a defalcation pursuant to 11 U.S.C. § 523(a)(4)?

## STANDARD OF REVIEW

Rule 8013 of the Federal Rules of Bankruptcy Procedure provides that, on appeal, the bankruptcy court's findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses. The Fifth Circuit recognized this standard in the matter of *In re Niland*, 825 F.2d 801, 806 (5th Cir.1987), quoting the following from *Wilson v. Huffman (In re Missionary Baptist Foundation of America )*, 818 F.2d 1135, 1142 (5th Cir. 1987) (citations omitted):

"A Court's conclusions of law are freely reviewable on appeal. As to all findings of fact, however, a reviewing court of a bankruptcy decision must accept the findings as found, unless they are clearly erroneous." A finding of fact is clearly erroneous "when although there is evidence to sup-

5. This amount was never paid to the Medus brothers. Perry subsequently filed for bankruptcy protection, and the present litigation ensued.

port it, the reviewing court is left with the definite and firm conviction that a mistake has been committed." ... "When a finding of fact is premised on an improper legal standard, or a proper one improperly applied, that finding loses the insulation of the clearly erroneous rule."

## DISCHARGEABILITY UNDER § 523(a)(4)

■ The first three issues delineated above concern the Bankruptcy Court's judgment in favor of the Medus brothers after having found a defalcation under 11 U.S.C. § 523(a)(4). Because these issues are intricately interwoven, they will be discussed together.

The first question is whether the Bankruptcy Court applied the proper legal standard for a finding of "defalcation." Section 523(a)(4) states that:

(a) A discharge ... does not discharge an individual debtor from any debt—

(4) for fraud or *defalcation while acting in a fiduciary capacity*, embezzlement or larceny....

(Emphasis added.)

■ The Fifth Circuit has defined "defalcation" as a "willful neglect of duty, even if not accompanied by fraud or embezzlement." *Matter of Moreno*, 892 F.2d 417, 421 (5th Cir.1990). *See also Roy v. Gravel*, 143 B.R. 825, 827–28 (W.D.La.1992).

Perry first contends that the Bankruptcy Court applied the improper standard set forth in the case of *In re Codias*, 78 B.R. 344, 346 (Bankr.S.D.Fla.1987).

The Bankruptcy Court in its *Memorandum Opinion* cited *Moreno* as the basis for its first conclusion that a defalcation had occurred. *Memorandum Opinion*, p. 23.

The Bankruptcy Court concluded that Perry's "unauthorized borrowing in the corporate name and the use of corporate assets to obtain funds for capitalization constituted a defalcation that breached his fiduciary obligation to the Corporation and the other stockholders," citing *Moreno, Codias*, and *In re Chris J. Roy, Law Corp.*, 130 B.R. 214 (Bankr.W.D.La.1991). *Memorandum Opinion*, p. 23. As to this conclusion, the Court holds that the Bankruptcy Court was not clearly erroneous in its findings of fact and relied on the correct legal standard.[6]

However, the Bankruptcy Court did not cite *Moreno* for the second basis of its conclusion that a defalcation had occurred. *Memorandum Opinion*, p. 24. The Bankruptcy Court stated that Perry's use of the corporate borrowing resolution prepared by Collier, "evidently without any board of directors meeting ever being held, is *also* a breach of his fiduciary obligation." *Id.* (Emphasis added.)[7] The Bankruptcy Court continued by disregarding Perry's "lame explanation" that he relied on his attorney, Collier, to prepare the appropriate documents despite the fact that the corporation's by-laws obligated Perry, as Secretary, to give notice of board meetings and to record all proceedings in a minute book. (Exhibit P8.) Further, the Bankruptcy Court found no proof a meeting was ever held on August 23, 1985, as the resolution recites, or that a meeting was ever held authorizing Perry to borrow in the name or the Corporation or encumber its assets. The Bankruptcy Court also found the testimony of Perry and Baas that Paul Medus was informed of the loan was not credible and further found the resolution to be suspicious in and of itself. The Bankruptcy Court concluded: "This conduct by the debtor is *far more* than the 'slightest misconduct' or the 'merest deficit caused by

---

6. The Court recognizes that in addition to citing *Moreno* as the basis for these findings of defalcation, the Bankruptcy Court also cited *Codias* and *Chris J. Roy*. Because the Bankruptcy Court in this case cited *Moreno*, this Court need not decide whether *Codias* and *Chris J. Roy* are consistent with *Moreno* in regard to these findings of defalcation.

7. The Court recognizes an argument could be made that Perry's use of the corporate borrowing

resolution is an action included within his unauthorized borrowing in the corporate name and use of corporate assets to fund his portion of the capitalization. As such, it could be part of the basis for the Bankruptcy Court's first conclusion that a defalcation occurred. However, the Bankruptcy Court's use of the word "also" indicates that it deemed the use of the corporate borrowing resolution to be a separate basis for its decision.

the debtor's misconduct' described as sufficient defalcation in the *Codias* and *J. Chris Roy* [sic] cases." *Memorandum Opinion,* p. 24. (Emphasis added.)

As will be discussed herein, the Court does not find the Bankruptcy Court's findings of fact to be clearly erroneous. However, this Court is unable to determine from the quoted language, especially the use of the phrase "far more," whether the Bankruptcy Court applied the "willful neglect" standard of *Moreno* or the seemingly less stringent standards of *Codias* and *Chris J. Roy*. Therefore, the Bankruptcy Court's decision on Perry's use of the corporate borrowing resolution as being a defalcation will be reversed and remanded for a determination of these facts under the appropriate standard of law.

As noted, after a thorough review of the record, the Court does not find the Bankruptcy Court's findings of fact to be clearly erroneous. Perry's actions in causing the Corporation to borrow $180,000 and in encumbering corporate assets in his fiduciary capacity as Secretary are amply supported by the record. So too is the fact that Perry, as the Corporation's Secretary, was bound by the Corporation's by-laws to give notice of meetings of the Board of Directors and to record all proceedings in a minute book. (Exhibit P8.) There was no proof that, even if a meeting was held on August 23, 1985, Perry was given corporate authority to borrow on behalf of the Corporation or that any resolution was adopted authorizing Perry to borrow $180,000 in the corporate name or to secure the loan with corporate assets. Additionally, there was testimony that no meeting ever took place on August 29, 1985. Therefore, the Bankruptcy Court's findings are amply supported by the record.

Further, in light of the testimonial evidence, the Court finds support for the Bankruptcy Court's finding that the resolution authorizing borrowing is suspicious in naming only Perry, the corporate secretary, as the corporate officer authorized to borrow, in being certified by Perry and in having no date of certification.

.Finally, the Court does not find the Bankruptcy Court erred in finding that the testimony of Baas and Perry that they informed Paul Medus of the loan was not credible. As Rule 8013 of the Bankruptcy Rules provides, the Court must give the Bankruptcy Court due regard for its observance of the witnesses and its rejection of their credibility in this case. Further, the Court notes the impeachment of Baas and Perry on this issue. (Transcript, Vol. 2, pp. 47–48; Transcript, Vol. 3, pp. 65–67.)

In support of his argument that the Bankruptcy Court's findings were contrary to the evidence adduced at trial,[8] Perry relies on the testimony of Paul Medus to the extent that the financed portion of the capitalization loans were to be repaid by corporate proceeds. (Transcript, Vol. 1, pp. 188–89.) Thus, Perry argues, Paul Medus knew the loan was being made. However, this is an improper extrapolation of Paul Medus' testimony. Paul Medus testified as follows:

Q. Now, we've heard about the capital investments of 10 percent by you and your brother and 10 percent by Mr. Perry of the initially agreed upon capital. How was the other 90 percent of those loans to be repaid? Your loan, your brother's loan and Mr. Perry's loan.

A. It was suppose [sic] to be paid by the proceeds of Perkins at College as long as the bucks were there.

Q. So, really, at the time it was intended by the parties involved that the corporation would be able to pay the debts of the individuals for putting up the borrowed capital.

A. Yes, sir.

(Transcript, Vol. 1, pp. 188–89.)

Medus' testimony indicates that the Corporation would pay the loans when the Corporation received proceeds but not that corporation assets could be used to secure the loans in the first place.

Perry also argues that Collier testified that Perry's capitalization of the corporation, in-

8. The Court notes that Perry does not argue on appeal that he did not have a fiduciary duty to the corporation or its shareholders. Moreover, the Court finds the Bankruptcy Court's analysis of Perry's fiduciary status correct under applicable federal and state law.

cluding the Crescent City Bank financing, was discussed with Paul Medus. (Transcript, Vol. 2, pp. 86 and 165.) Collier testified as follows:

A. I recall many discussions with Mr. Paul Medus specifically about the entire capitalization of the business which would have included the Crescent City Bank.

Q. And this would have taken place prior to January of 1986, is that correct, when the loan was made.

A. Yes, sir.

\* \* \* \* \* \*

A. . . . And they were very aware that Mr. Perry was pursuing an additional loan at Crescent City Bank and were aware, in fact, that the loan did require additional security, as far as I knew.

However, this testimony does not state that the Medus brothers knew Perry was going to secure corporate assets for the Crescent City Bank loan, only that the Medus brothers were aware that Perry was trying to get a loan from Crescent City Bank. Further, there was unrebutted testimony from Paul Medus that at a meeting among the Medus brothers, Collier and Perry in February 1987, when Perry indicated that the Crescent City Bank loan was a personal loan, Collier said: "Ernie, if that's your personal loan we've got a problem." (Transcript, Vol. 2, p. 147.)

Perry further argues that his advances of cash and inventory to the Corporation from Bake, Inc., a corporation wholly owned by Perry, show that there was no defalcation. Specifically, he contends that these advances, when viewed in the totality of the evidence, do not show bad faith or misconduct on his part. Notwithstanding whether "misconduct or bad faith" is the legal test for defalcation, *see Moreno, supra,* the Court holds that these advances are irrelevant in terms of Perry's actions in alienating Corporation assets without the knowledge of or authorization by the Corporation.

■ Perry's final argument is that the Medus brothers failed to carry their burden of proof. The Court recognizes, as Perry contends, that limits on dischargeability of debts contained in 11 U.S.C. § 523 are to be con-strued narrowly so as to assure that the basic policy of giving an honest debtor a fresh start is not frustrated. *See Geason v. Thaw,* 236 U.S. 558, 562, 35 S.Ct. 287, 289, 59 L.Ed. 717 (1915). However, in this case, in view of the Bankruptcy Court's findings of facts and conclusions of law, at least insofar as Perry's unauthorized borrowing and improper encumbrance of corporate assets is concerned, the Medus brothers certainly sustained their burden in establishing defalcation by a fiduciary, Perry, under the preponderance of evidence standard. *See Grogan v. Garner,* 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).

In further support of his final argument, Perry contends that *Moreno* and *John P. Maguire and Company, Inc. v. Herzog,* 421 F.2d 419 (5th Cir.1970) both require a utilization or diversion of monies by the debtor for personal gain in order for there to be a defalcation under 523(a)(4).

■ First, the Court does not read those decisions as requiring personal gain for there to be a finding of defalcation. In *Moreno,* the Court of Appeals stated that "[w]hether the money served Moreno personally, as the bankruptcy court found, is significant but not necessarily determinative." *Moreno,* 892 F.2d at 421. The Court proceeded to define defalcation as "a willful neglect of duty, even if not accompanied by fraud or embezzlement" and discussed the debtor's duty as a fiduciary to the corporation not to loan money to himself. *Id.*

In *Maguire,* the Fifth Circuit noted that the "direction and application [by appellant] of proceeds from sales of American furniture to creditors other than appellee, to whom the payments were due, . . . is the basis of the present suit." *Maguire,* 421 F.2d at 422. In analyzing the predecessor statute of 11 U.S.C. § 523(a)(4), the court of appeals first noted cases where courts had found a "misappropriation" had occurred by an officer or fiduciary of a corporation. *Id.* at 421–22. The court then stated: "Hence, it can be seen that [the predecessor statute] has been applied when an officer of a corporation has misused his position to gain a personal benefit at the expense of the corporation or per-

sonal creditors." *Id.* at 422. The court of appeals then affirmed a district court finding "that appellant was partially motivated by a desire to indemnify himself against loss when he applied proceeds owing to appellee to other claims on which he was secondarily liable." *Id.* The debtor in *Maguire* misused his corporate position to receive indemnification, not direct, personal, financial gain.

That is exactly what the Bankruptcy Court found in this case and what this Court agrees is a defalcation under *Moreno.*[9]

In summary, the Court finds that the Bankruptcy Court was not clearly erroneous in its findings of fact in regard to its ruling on the Medus brothers' claim under 11 U.S.C. § 523(a)(4). Additionally, in regard to Perry's unauthorized borrowing in the corporate name and improper alienation of corporate assets, the Bankruptcy Court applied the correct standard of law. Further, the Bankruptcy Court's findings and conclusions (except for the single issue for which remand is proper) were not contrary to the evidence introduced at trial. The Medus brothers also carried their burden of proof in showing a defalcation. Therefore, the Bankruptcy Court will be affirmed in regard to these aspects of its decision.

However, in regard to the Bankruptcy Court's finding of defalcation through Perry's use of the corporate borrowing resolution, the Court reverses and remands to the Bankruptcy Court for application of the appropriate standard of law to the facts of this case.

### DISCHARGEABILITY UNDER § 523(a)(2)(A)

The Medus brothers contest the Bankruptcy Court's conclusion that they failed to carry their burden of proof in establishing a limitation on discharge under 11 U.S.C. 523(a)(2)(A) in that Perry aided and abetted in setting the fire at the Corporation's store.

Section 523(a)(2)(A) states:

(a) A discharge under section 727 ... of this title does not discharge a debtor from any debt—

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition.

The Fifth Circuit has set forth the elements necessary to establish a violation of § 523(a)(2)(A):

[A] cause of action for fraud will exist under 11 U.S.C. § 523(a)(2)(A) when a debtor makes promises of future action, which, *at the time they were made,* he had no intention of fulfilling. In order to succeed on this legal theory, the objecting party must prove that: (1) the debtor made representations; (2) at the time they were made the debtor knew they were false; (3) the debtor made the representations with the intention and purpose to deceive the creditor; (4) that the creditor relied on such representations; and (5) that the creditor sustained losses as a proximate result of the representations. *In re Bercier,* 934 F.2d 689, 692 (5th Cir. 1991) (Citations omitted.) (Emphasis in original.)

Specifically, the Medus brothers contend that they established sufficient facts to show that Perry aided and abetted in setting the fire which destroyed the property of the Corporation's store. These facts included the intentional setting of the fire by someone who apparently knew the store's layout and alarm system, including the lack of a fire alarm.

These facts also included, as described by the Medus brothers, Perry's motive in setting the fire. The Medus brothers argue the motive was apparent because the inventory level was inflated by Perry to the Medus brothers and in that the contents of the store were grossly overvalued and overinsured at $1 million. Indeed, the Medus brothers ar-

---

9. Moreover, even assuming Perry is correct in his argument that there must be a utilization of corporate funds for his own use, Perry's actions in this case fall within that realm. The facts show that he utilized corporate assets for his own use, *i.e.,* he hypothecated corporate assets to receive a loan for monies he was personally supposed to put forth to capitalize a corporation.

gue, the insurance had been increased from $400,000 to $1 million before the fire. Further, according to the Medus brothers, Perry allowed taxes to go unpaid; additionally, his personal loans, his lease payments for the store site and his payments to his accountant were in arrears. Perry also was involved in litigation with other franchisees, which, according to the Medus brothers, further exacerbated Perry's financial woes.

The Medus brothers also contend that Perry allegedly misappropriated $36,000 in salvage proceeds and failed to account for these proceeds to the Medus brothers. Their argument continues that Perry's actions also caused CNA to deny insurance coverage and left the Corporation with no insurance.

Finally, in support of their argument, the Medus brothers rely on Perry's failure to put forth his share of the capitalization of the Corporation; his actions with Crescent City Bank; his renegotiation of the lease between himself and the landlord, resulting in a $15,700 decrease in rent to himself, which he did not pass onto the Corporation; and his presentation to the Medus brothers of inflated and erroneous financial statements of the Corporation.

After reviewing these arguments and the Bankruptcy Court's findings of fact and conclusions of law on this issue, the Court finds that the Bankruptcy Court correctly applied the law to the facts of this case and correctly found that the Medus brothers failed to sustain their burden of proof.

■ In regard to Perry's actions in regard to the fire at the store, the Bankruptcy Court properly concluded that the evidence fell short of the required proof that Perry set the fire or benefitted to the detriment of the Medus brothers as a result of the fire. As the Bankruptcy Court stated, the evidence is insufficient under the *Bercier* standard that Perry made the requisite false representations to the Medus brothers as to the amount of the inventory, the insurance, the cause of the fire or the distribution of the salvage.[10]

■ Similarly, while the Medus brothers established that Perry did not comply with the capitalization of the Corporation as understood by the Medus brothers or as set forth in the memorandum of August 30, 1985, to the shareholders from Collier (Exhibit P7), there is insufficient evidence that Perry's failure to comply with the capitalization as set forth in that memorandum was a willful misrepresentation by Perry as required under *Bercier*. Nor was their sufficient evidence that Perry's failure to comply with the capitalization as understood by the Medus brothers showed he aided or abetted in the setting of the fire.

■ In regard to the alleged lease payment windfall on the primary lease of the property where the store was located, the Court again agrees with the Bankruptcy Court that the Medus brothers failed to carry their burden. There is insufficient evidence that Perry made a misrepresentation to them at the time he obtained their investment about the decrease in the rent on the primary lease on the property.[11] Similarly, there is insufficient evidence to show how this alleged windfall showed Perry assisted in setting or set the fire.

Therefore, the Court will affirm the Bankruptcy Court's decision on dischargeability under 11 U.S.C. 523(a)(2)(A).

### LEASE PAYMENT "WINDFALL" AS DEFALCATION

Because the Bankruptcy Court found a defalcation by Perry, the Bankruptcy Court did not consider whether the lease payment "windfall" constituted a defalcation under 11 U.S.C. § 523(a)(4). On cross-appeal, the Medus brothers state: "If the decision of the Bankruptcy Court is affirmed; [sic] this issue does not need to be addressed. If any

10. As to the salvage proceeds, the Court notes Perry's testimony that the money was used to pay the obligation of the Medus brothers and Perry as well as to reimburse cash advances by Perry to the Corporation for rent and insurance. (Transcript, Vol. 3, pp. 79–81.)

11. Further, the Court notes that there is testimony by Paul Medus that he knew of the lease between the Cangelosi family and Perry at the time of his investment and knew there was a difference in the lease payment and sublease payment in Perry's favor. (Transcript, Vol. 1, pp. 99, 191–92.)

other action is taken on appeal, then this issue should be addressed on remand." (Brief on behalf of Medus brothers, Document 7, p. 23.)

Because the Court affirms in part the Bankruptcy Court judgment in favor of the Medus brothers and against Perry (even though it reverses and remands that judgment in part), the Court construes the Medus brothers' foregoing statement in their cross-appeal as an abandonment of this issue. Thus, the Court does not address this issue.

Accordingly, .

**IT IS ORDERED** that the judgment of the Bankruptcy Court in favor of the Medus brothers and against Perry on the issue of dischargeability pursuant to 11 U.S.C. § 523(a)(4) is **AFFIRMED IN PART** and **REVERSED AND REMANDED IN PART.**

**IT IS FURTHER ORDERED** that the judgment of the Bankruptcy Court in favor of Perry and against the Medus brothers on the issue of dischargeability pursuant to 11 U.S.C. § 523(a)(2)(A) is

**AFFIRMED.**