**HOME TELEPHONE COMPANY, Plaintiff,**

v.

**Lon DARLEY and Rex Darley, Defendants.**

**No. DC 71–68.**

United States District Court, N. D. Mississippi, Delta Division.

Feb. 28, 1973.

Robert H. Weaver, Jackson, Miss., for plaintiff.

Ross L. Franks, Hernando, Miss., for defendants.

## MEMORANDUM OPINION

KEADY, Chief Judge.

Invoking diversity jurisdiction, Home Telephone Company (Home), a Mississippi corporation, sues Lon Darley and Rex Darley (Darleys), Tennessee citizens, for alleged breach of fiduciary duties as former officers, directors and controlling stockholders of Home. The complaint charges that the Darleys caused Home to breach a merger agreement it had made with a major independent telephone system, Mid-Continent Telephone Corporation (Mid-Continent) of Hudson, Ohio, and seeks the recovery of the principal amount of the judgment

($238,028.97) heretofore obtained against Home by Mid-Continent in prior litigation, Mid-Continent Telephone Corp. v. Home Telephone Co., 319 F. Supp. 1176 (N.D.Miss.1970), plus accrued interest ($4,536.83) and attorney fees and costs ($19,345.19) incurred in that proceeding. In their answer denying liability, the Darleys assert that the decision not to carry out the merger agreement received the prior approval of Home's common stockholders and that its preferred stockholders suffered no loss by the decision. It is further asserted that Union Telephone Company (Union), as subsequent purchaser of the common stock from the Darley family, was before and at the time of purchase not only aware of the outstanding merger agreement but actively induced the Darleys to repudiate the agreement and sell the common stock to Union. The principal defense is that Union, the present owner of Home's entire common stock, would be unjustly enriched if Home is allowed to recover in this action, and that Home is accordingly estopped to complain of the breach of contract and ensuing losses.

The case has been submitted upon the record made in Mid-Continent's suit, supplemented by certain documentary exhibits. The court in deciding that case made extensive findings of fact narrating the making by Home on November 15, 1968, of the merger agreement with Mid-Continent and subsequent events culminating in the repudiation of that contract on March 19, 1969. While all such findings are incorporated herein by reference, only a portion will be restated. The issue of the Darley's personal responsibility to Home was left open by the court since Home sought no relief, by way of cross-claim, against the Darleys, also defendants in the Mid-Continent case.[1]

Prior to March 19, 1969, Home's entire common stock (2000 shares) was owned by the Darley family as follows:

Lon Darley, 1490 shares, Rex Darley, son of Lon Darley, 360 shares, Lon Darley, Jr. and Howard Darley, also sons of Lon, and Ben Mitchell, stepson of Lon, 50 shares each. Home had also issued and outstanding 398 shares of $10 par value 5% preferred stock, representing a total investment of $3,980; these shares were, and continue to be, held by 43 different individuals who resided in different states and most of whom were not related to the Darley family. The preferred stock as originally issued was non-callable and non-voting but by a 1956 charter amendment became voting shares.

Lon Darley as president and majority stockholder controlled and dictated the affairs of the company; his son Rex was Home's vice-president and active in management; Rex's wife Jacqueline was secretary, and Lon's wife Lulah was treasurer. Home had 5 directors: Lon, Rex, Thomas Doddridge, Jimmy D. Young, both Home employees, and William W. Kerr, the local banker. When Lon on behalf of Home negotiated the merger agreement with Mid-Continent, the directors were advised and acquiesced in the transaction. The common stockholders were notified and informally assented. No contact was made, however, with the preferred stockholders, nor their approval sought. Both Mid-Continent and the Darleys regarded the preferred stock as an interest not sufficiently substantial to affect the plan of merger.

Following the execution of the merger agreement, Home's common shareholders, at a meeting held January 20, 1969, reelected Rex and Kerr as directors and elected as new directors James W. Woods, Home's attorney; M. C. Herrington and Ray Magee, local citizens. The new directors, who were selected by Lon Darley, were apprised of the impending merger. There was no change in Home's officers until April 15, 1969—after the stock sale to Union had been

---

1. "In the absence of a cross-claim by Home against Lon Darley and Rex Darley for their acts as officers, directors and controlling stockholders, we expressly pretermit any consideration of their individual liability to Home for financial loss." p. 1199.

consummated—when the Darleys resigned their offices; and Rex was elected president, Doddridge vice-president and Clarke M. Williams, Union's top executive, secretary and treasurer. Rex Darley was employed as Home's general manager for a term of ten years at $18,000 annual compensation by formal contract with CT&E, Union's parent.

The factors which motivated Lon and Rex Darley to cause Home to repudiate Mid-Continent's merger agreement are as follows:

"Thereafter, Williams, a person of large net worth, met with Lon and Rex Darley in Memphis on February 28 and offered to purchase Home's common stock for approximately $1,650,000 cash. At this meeting Lon Darley advised Williams that it would take $2,000,000 cash to purchase the stock. Lon Darley calculated this would be the cash equivalent of the Mid-Continent offer plus about $600,000 for payment of capital gains taxes. Williams knew, or had reason to know, that Home had entered into a merger agreement of some nature with Mid-Continent but he did not at any time inquire of the Darleys as to its status, or otherwise investigate the situation.

"On March 10 Williams made a firm $2,000,000 cash offer for Home's common stock and delivered to Lon Darley his personal check for $100,000 to bind the deal. At this juncture the Darleys advised Williams that a merger agreement had been signed with Mid-Continent and they needed to obtain a legal opinion from their counsel regarding its obligatory effect before responding to his offer. Williams made no move to check into the matter. It was approximately at this time that Home's attorneys, who were unaware of the Williams offer, had received the draft of the reorganization plan from Mid-Continent's attorneys and were requested by Lon Darley to give an opinion as to its enforceability. The Darleys offered to show Williams a copy of the November 15 agreement, but Williams declined to make such examination, stating that the less he knew about it the better. At this same meeting the Darleys told Williams that it was possible that Mid-Continent would sue if Home's stock were sold to him.

"The Darleys decided to accept the $2,000,000 cash offer from Williams and the funds were paid over to Home's common stockholders on or about March 24, 1969, when the 2000 shares of Home's common stock, duly endorsed, were delivered to Williams by all the Darleys. The stock was actually transferred to Union, a Mississippi corporation which had been organized by Williams for the sole purpose of receiving the stock. At the same time, Rex Darley executed a management employment contract with CT&E, Union's parent, for a ten-year period at an annual salary of $18,000. These transactions completed the sale of Home's stock to Union, which ignored all subsequent demands of Mid-Continent that the November 15 agreement had been breached by the Darleys and that Mid-Continent had the right to compel performance from not only the Darleys but Williams and Union." 319 F.Supp. 1186–1187.

When Lon Darley decided that it was to the financial interest of himself and his family to accept Union's cash offer rather than enter into the stock exchange, neither he nor Rex notified the preferred stockholders or the other directors of Home of their decision that Home should breach the merger agreement. Although this decision was disclosed only to Darleys' attorney, Lon nevertheless had authority from Rex and the other common shareholders to act as he saw fit in disposing of their stock. After the stock sale to Union, Rex Darley served as Home's president and general manager until January 20, 1970. At that time CT&E bought back Rex's long-term employment contract as general manager, paying him $90,000 in a lump sum, and Rex resigned his positions as director of Home and as vice-president of CT&E.

After Union became Home's sole common shareholder, various meetings of the new board of directors were held for transacting company business. This included resolutions ratifying Rex's employment as general manager in accordance with prior contract made by CT&E, borrowing $2,000,000 for the purchase of central office equipment, amending by-laws to increase the number of directors from 5 to 7 and provide additional offices. These directors' meetings took place at different times throughout the year 1969; on December 23, 1969, Home's stockholders, both common and preferred, met and ratified the directors' actions in borrowing $2,000,000 and amending by-laws. On September 16, 1970, Home's stockholders met again, this time to amend the by-laws to increase the number of directors from 7 to 8. At no time did the stockholders vote on the acts of the Darleys in withdrawing from the merger; the first action of Home's directors occurred December 16, 1970, when it was voted to sue Rex and Lon Darley for the damages recovered by Mid-Continent.

Mid-Continent's suit, filed May 5, 1969, terminated in judgment September 28, 1970, against Home for $218,000 as damages allowed to Mid-Continent from Home's wrongful breach of contract. This figure was determined to be the difference between Home's asset market value of $1,650,000 and 64,000 Mid-Continent shares worth $1,432,000. This judgment on November 23 was amended by assessing Home with additional damages of $20,028.97 representing accrued interest since March 19, 1969. This total judgment ($238,028.97), plus $4,536.-83 post-judgment interest, was paid by Home on March 3, 1971, with funds advanced by Union. Union charged Home $19,345.19 as its share of the litigation expense in defending Mid-Continent's suit. Union obtained these funds from CT&E. Home has since repaid Union a substantial portion of this indebtedness, but as of October 1972, the unpaid balance owing to Union was $142,096.17.

Home's 1971 financial statement reflects changes in its capital stock and earned surplus accounts, as reported by the auditor, as follows:

| Capital Stock and Surplus | | 12/31/71 | 12/31/70 | Increase (Decrease) |
|---|---|---|---|---|
| Capital Stock—Preferred | (8) | $ 3,980.00 | $ 3,980.00 | $ .00 |
| Capital Stock—Common | (8) | 10,000.00 | 10,000.00 | .00 |
| Unappropriated Earned Surplus | (9) | 123,867.03 | 304,181.29 | (180,314.26) |
| Contributions to Telephone Plant | | 952.78 | 952.78 | .00 |
| Total Capital Stock and Surplus | | $ 138,799.81 | $ 319,114.07 | $(180,314.26) |
| Long-Term Debt | (10) | $2,736,730.09 | $2,380,102.43 | $ 356,627.66 |

(8) Capital Stock—Preferred. Company has authorization from the State Regulatory Body to issue 1,000 shares having a par value of $10.00 per share. At the balance sheet date, there were 398 shares outstanding. A preferred dividend of $198.50 was paid.

Capital Stock—Common. Company has authorization from the State Regulatory Body to issue 2,000 shares having no par value. At the balance sheet date, there were 2,000 outstanding shares. There were no dividends paid or secured during the period under examination.

(9) Unappropriated Earned Surplus for the twelve months ended December 31, 1971, is reconciled as follows:

| | | |
|---|---|---|
| Balance, December 31, 1970 | | $304,181.29 |
| Credits: | | |
| Net Income for the Year 1971 | | 81,795.23 |
| | | $385,976.52 |
| Debits: | | |
| Mid-Continent Law Suit Judgement | $242,565.80 | |
| Mid-Continent Law Suit Legal Fees | 19,345.19 | |
| Preferred Stock Dividend | 198.50 | |
| Total Debits | | 262,109.49 |
| Balance, December 31, 1971 | | $123,867.03" |

Thus, after absorbing losses for the judgment and litigation expense, Home's book net worth was reduced 56% over what it had been the previous year. The preferred stockholders, who have been paid regular dividends without interruption, have taken no action to approve or disapprove the acts of the Darleys which caused Home to breach the merger agreement and suffer substantial loss in litigation. Neither does it appear that REA, the holder of a large mortgage against Home's physical assets for capital financing, was ever consulted by the Darleys, or its approval obtained, before the officers decided to breach the merger agreement.

Home's sole business activity is to furnish dial telephone service to subscribers in a portion of Marshall and DeSoto Counties, Mississippi, for which it holds a certificate of public convenience and necessity granted by the State Public Service Commission.

■■ Emphasizing that as a corporation it is an entity separate and distinct from its stockholders and entitled to sue for its own loss, Home seeks to impose liability on Lon and Rex Darley upon either of two closely related grounds: (1) The Darleys as officers in control of Home, owed a fiduciary duty to the corporation which they violated by causing Home to breach the merger agreement for no corporate business purpose and solely for their own personal gain; and (2) the Darleys are liable in tort for causing Home to breach its contract with Mid-Continent in bad faith and without reasonable justification. Defendants urge that the acts of the Darleys were ratified by Home's directors and common shareholders; that the preferred stockholders, although not consulted at any point in the dealings, were not in any way injured and have registered no complaint; and finally, if Home were allowed to recover, Union, its sole common shareholder, would be the beneficiary, a result claimed to be grossly inequitable since Union, through its alter ego, Clarke Williams, knowingly induced the Darleys to breach Home's agreement by offering a greater consideration for the Darleys' common stock than they would have received under the merger agreement.

In this diversity case the court is *Erie*-bound to apply Mississippi law. Although there appears to be no factual precedent in the Mississippi decisions, the jurisprudence of that state recognizes well-established principles of corporation law which exist for our sure guidance and compel recovery for Home.

■■ It is hornbook law that a corporation is an entity separate and distinct from its members and shareholders and may sue to recover its losses. I. C. R. R. Co. v. Mississippi Cottonseed Products Co., 166 Miss. 579, 148 So. 371 (1933); Pigott v. Texaco, Inc., 358 F.2d 723 (5 Cir. 1966); Miss.Code Ann. § 5309–04(b). While in certain instances courts have disregarded the corporate entity as a matter of public policy or to prevent fraud, there is no basis for refusing to recognize Home's status as an active, viable corporation which has had continuous business operations since 1947. The mere fact that Union may presently own all of the common stock is no justification for piercing the corporate veil, or for ignoring the separate legal identity of Home. 1 Fletcher Cyc. Corp. § 28, p. 124. We are not impressed with the argument that a recovery by Home for its substantial loss, thus being restored to its former net worth position, is a "reward" to Union. A recovery in this case will inure directly to Home's benefit, and only incidentally to Union as sole common shareholder. Moreover, where the corporation has a right of action against a defaulting officer, the law takes cognizance of damages proximately suffered by the corporation, and is not at all concerned with whether a particular stockholder or class of stockholders can show direct or individual prejudice. It is undisputed, however, that the equity of Home's stockholders was to a major degree diminished because of the breach of the

merger agreement. Not only was the interest of the stockholders detrimentally affected, but the ability of the corporation to continue its business operations would have been in grave doubt except for the availability of borrowed money to satisfy the judgment.

 Mississippi follows the generally recognized rule that the directors and other officers of a corporation, while not trustees in the technical sense in which that term is used, "occupy a fiduciary relation to the corporation and to its stockholders." Knox Glass Bottle Co. v. Underwood, 228 Miss. 699, 89 So. 2d 799, 814 (1956); Cooper v. Mississippi Land Co., 220 So.2d 302 (Miss. 1969). As such, an officer or director must act in accordance with the best interests of the corporation and by the strict standards of rectitude that bind a fiduciary; he is not entitled to use his position for personal gain where harm will befall the corporation, its creditors, or stockholders. Should an officer have a personal interest that conflicts with the interests of the corporation, the officer may not act to the corporation's detriment and must guard its interest. *Knox Glass Bottle Co.*, supra. It is no answer to say that the entire Darley family, as owners of the common stock, assented to the acts of Lon and Rex Darley in causing Home to breach its contract, and, therefore, Home has no ground for complaint. Neither the creditors, including REA, Home's first mortgagee, nor the preferred stockholders were shown to have approved the conduct by Darleys which directly caused the corporation to suffer serious financial loss.

There can be no doubt that by renouncing the contract with Mid-Continent the Darleys were acting solely for their personal gain. Home had no prospect of realizing any benefit whatever from the repudiation; its interests were not at all served by the price the Darleys got for their stock. The breach was dictated only for the financial gain of the managing officers and their family. By Mid-Continent's offer, Lon Darley would have received stock having a value of $1,066,840, or $423,160 less than he obtained in cash from Union. Rex Darley would have received stock valued at $257,760, or $102,240 less than the cash paid by Union. Rex also obtained from Union a more favorable management contract than the one offered by Mid-Continent. Indeed, the fact that the Darleys were wholly serving their own interest, and not Home's, was specifically determined by this court.[2]

 It plainly appears that when Lon and Rex Darley decided to repudiate the Mid-Continent agreement, they did so with full knowledge of the likely consequences. They anticipated that litigation would probably be instituted by Mid-Continent; they knew that serious issues were raised in renouncing the contract and could ignore Mid-Continent's demands only at their peril; and they also knew that if Home was held liable, the damages recoverable by Mid-Continent might well jeopardize Home's solvency, or at least severely handicap its ability to carry on normal business operations. With matters in this posture, it was improvident for the Darleys to act as they did in complete disregard of Home's position.

 Indeed, the fiduciary duty of a managing officer of a public service corporation, like Home, is, if anything, more binding than in the case of an or-

---

**2.** "There were, in fact, no local pressures or problems compelling Home to terminate the contract immediately for the purpose of obtaining additional capital from other sources; the only impetus for the decision to repudiate the Mid-Continent contract was the highly profitable cash offer which Home's stockholders received from a third party. On that factual basis, we must hold that Home's action was a wrongful repudiation and breach of its contractual obligations and not a justified rescission." 319 F.Supp. 1196.

dinary business corporation. When the public interest is directly concerned, actions of managing officers in a corporation whose affairs are subject to regulation by public authority are to be closely scrutinized. The primary duty of such an entity is to serve the public interest contemplated by its charter. Under state law, the certificate of convenience and public necessity held by Home was subject to revocation if it failed to render "reasonably adequate service." Miss.Code Ann. § 7716–05(f). In view of the special privileges and obligations of a public service corporation, or one affected with a public interest, it is imperative that its business affairs always be conducted by the managing officers prudently and in keeping with the need of the public it serves. The court is compelled to hold that Lon and Rex Darley violated their fiduciary obligations as Home's managing officers by inducing the corporation to breach a binding contract solely to promote their own personal advantage.

■■■■ Apart from a fiduciary relationship, an additional ground of liability for defaulting officers arises in tort where officers cause the corporation under their management and control to breach a contract with a third party in bad faith and without reasonable justification. In such cases, liability rests upon the common law rule which imposes legal responsibility upon every agent who violates his authority or neglects his duty to the damage of his principal. 19 Am.Jur.2d, Corporation, § 1278, p. 686. Although an officer is surely not liable for honest errors or mistakes of judgment when acting in good faith, this does not excuse mistakes where the loss is the result of failure to exercise ordinary care, skill and diligence. 3 Fletcher Cyc. Corp. §§ 1039–1040, pp. 621–628. See United States v. Islip Machine Works, Inc., 179 F.Supp. 585 (E.D.N.Y.1959). Applying this principle to the case sub judice, we find that Lon and Rex Darley could not possibly have believed that breaching the contract

with Mid-Continent would serve Home's corporate interests; on the contrary, they knew that their actions would lead to serious litigation brought agains Home with the prospect of great losses. The Darleys evinced no concern for Home's corporate welfare and utterly failed to explore steps which might be reasonably available to justify rescinding the merger agreement. Thus, we conclude that the defendants, by ignoring what was for Home's benefit and acting solely in their personal interest, were guilty of negligence; insofar as their principal—Home—was concerned, their acts in breaching the contract were in bad faith and without reasonable justification. The fact that Lon Darley first sought an attorney's opinion as to the obligatory nature of the letter agreement may not be invoked as a defense since he withheld from counsel essential, known facts and circumstances underlying the transaction.

■■■■ Defendants strenuously urge that their acts, even if violative of fiduciary duty or otherwise unauthorized, were nevertheless ratified by Home's stockholders, officers and directors and Home is estopped to complain. A corporation, like an individual, may, of course, ratify and thereby render binding upon it the originally unauthorized or tortious acts of its officers. 19 Am.Jur.2d, Corporations, § 1241, p. 650. Ratification may be express or implied. Concededly, the act of renunciation was not expressly ratified since the matter was never at any pertinent time expressly voted upon by the board of directors, nor did the stockholders, in formal meeting or other manner, expressly ratify the decision of Lon and Rex to withdraw from the merger agreement.

■■■■ The question that remains is whether ratification by all the stockholders may be fairly implied from the evidence. We conclude that it may not. In the first place, to establish ratification of a breach of duty to the corporation, the burden is upon the defaulting

officer to show that full and complete disclosure of all of the facts regarding the transaction in question, and its adverse effect upon the corporation, was made to the stockholders and that they knowingly assented thereto. Next, as a matter of principle, Lon and Rex had no power to ratify their own breach of duty, or unauthorized acts. 19 Am.Jur. 2d, ibid, § 1248, p. 655. Another settled principle is that a majority of the stockholders may not ratify acts of corporate officers so as to cut off the rights of minority stockholders where such acts are an abuse of the trust reposed in the officers. 3 Fletcher Cyc. Corp. § 982, p. 509. Lon and Rex are thus disqualified from ratifying their own acts. While Lon, Jr., Howard and Ben Mitchell, the minority common shareholders, left it up to Lon to dispose of their shares as he saw fit, the record fails to show that it was brought home to them that Lon and Rex, by repudiating the merger and making the sale to Union, were indeed acting adversely to Home's interest. Under such circumstances, their acquiescence or mere failure to object, without full knowledge of all pertinent facts, does not amount to implied ratification. Furthermore, evidence affirmatively shows that no approach whatever was made to the preferred stockholders; they remained ignorant of the entire transaction, and in no way may be deemed to have given their assent to a breach of contract contrary to Home's interest. We have scanned the business transacted at the several meetings of the directors and stockholders held since the merger agreement was breached, and find no evidence of a conscious and deliberate relinquishment of the claims held by Home against the defendants. The court may not fault the corporation for awaiting the outcome of the litigation with Mid-Continent before taking action against Lon and Rex. Home and the defendants made common cause in resisting Mid-Continent by denying the existence of a binding agreement, and it was reasonable and prudent to defer resolution of the issues presented in the present action.

Defendants finally argue that it is inequitable to allow Home to recover since this court has heretofore ruled that Union and Clarke Williams actively interfered with the contractual relations between Home and Mid-Continent under such aggravated circumstances as to render them liable for punitive as well as actual damages. We find this argument to be a complete non sequitur. Union and Williams were found to have committed a tort against Mid-Continent, and for that they were cast in substantial damages that they have paid. Lon and Rex Darley—not Union or Williams—owed Home the duty to be faithful to its interest, and may not be relieved of culpability by pointing to the conduct of persons who were then strangers to the corporation. We fully agree with the statement of plaintiff's counsel that holding Lon and Rex liable for Home's established loss is not a punishment but simply restores to the corporation the net worth position which it enjoyed at the time of defendants' wrongful repudiation. We also observe that in the stock purchase Union paid not only the proven market value of the corporate assets ($1,650,000) but a considerable sum in excess thereof ($350,000). The defendants are, therefore, left with a substantial profit from their stock deal with Union after making good the losses which they caused Home to suffer. Indeed, equity demands restitution by the defendants under such circumstances.

Home's demand includes an item of $19,345.19 incurred as attorney fees and costs in the original litigation. The assessment against an adversary of attorney fees and costs incurred in litigation is not ordinarily allowed in Mississippi. The established rule is that such items are proper elements for the court to consider only if punitive dam-

ages are recoverable, Kalmia Realty & Ins. Co. v. Hopkins, 163 Miss. 556, 141 So. 903 (1932), and the facts must establish the commission of a gross and willful wrong, Cooper v. USF&G, 186 Miss. 116, 188 So. 6 (1939). Exceptional circumstances to justify the allowance of punitive damages, and hence litigation expenses, do not appear in this case. In the prior litigation, Home and Union were represented by the same counsel, while Lon and Rex Darley had separate counsel. All of them, as parties defendant in Mid-Continent's suit, disputed and denied the existence of a binding agreement with Mid-Continent. The litigation was hotly contested and conducted in good faith at all stages. Serious issues of fact and law were raised for decision by the court. Union had charge of the defense insofar as Home was concerned and subsequently apportioned a certain percentage of fees and costs to Home out of costs common to their joint defense. Although the acts of Lon and Rex Darley did constitute breach of duty owed to Home as managing officers, their actions were not taken under circumstances rendering them liable for punitive damages. The court, therefore, declines to assess the defendants with any portion of Home's litigation expense.

It is proper, however, to allow the recovery of legal interest on the amount of the actual loss sustained by Home. This loss became fixed when it was reduced to judgment in favor of Mid-Continent and paid March 3, 1971. Defendants, who have had the use of such funds ($242,565.80), should be required to pay 6% interest thereon as part of the recoverable damages. State Highway Commission v. Wunderlich, 194 Miss. 119, 11 So.2d 437 (1943). Cf. Colonial Refrigerated Transportation, Inc., v. Mitchell, 403 F.2d 541 (5 Cir. 1968).

Judgment for plaintiff shall be entered accordingly.