**In re Gregory I. SALISBURY, Debtor.**

**Rain Bird Corporation, Plaintiff,**

**v.**

**Gregory I. Salisbury, Defendant.**

**Bankruptcy No. 03–10563.**

**Adversary No. 03–1104.**

United States Bankruptcy Court,
N.D. Mississippi.

Oct. 5, 2005.

---

Nina S. Tollison, Oxford, MS, for Plaintiff.

Robert A. Talley, Memphis, TN, for Defendant.

## OPINION

DAVID W. HOUSTON, III, Bankruptcy Judge.

On consideration before the court is a motion for partial summary judgment filed by the plaintiff, Rain Bird Corporation ("Rain Bird"); a response thereto having been filed by the defendant/debtor, Gregory I. Salisbury ("Salisbury"); memoranda of law having been submitted by both of the parties; and the court, having heard and considered same, finds as follows, to-wit:

### I.

The court has jurisdiction of the parties to and the subject matter of this proceeding pursuant to 28 U.S.C. § 1334 and 28 U.S.C. § 157. This is a core proceeding as defined in 28 U.S.C. § 157(b)(2)(I).

### II.

*Procedural Background and the Applicability of Collateral Estoppel*

Rain Bird filed a complaint on February 1, 2002, in the United States District Court for the Northern District of Mississippi against National Pump Company, LLC ("NPC"), Robert Milton ("Milton"), and Salisbury, Cause No. 2:02CV018–M–D. The complaint sought damages from the defendants under the following causes of action: tortious interference with contract, tortious interference with business relations, misappropriation of trade secrets, breach of fiduciary duty, and civil conspiracy.

During the pendency of the district court litigation, Salisbury filed a voluntary petition seeking relief under Chapter 7 of the Bankruptcy Code. Thereafter, Rain Bird initiated the above captioned adversary proceeding against Salisbury requesting this court to find that any debts, owed to Rain Bird as determined by the district court, to be non-dischargeable pursuant to § 523(a)(4) and (6) of the Bankruptcy Code. As a result of a separate motion, this court stayed the bankruptcy adversary proceeding, but lifted the automatic stay so that the district court litigation could be tried to a conclusion.

As an analysis of the factual events pertinent to this proceeding, the court incorporates by reference the Memorandum Opinion ("Mem.Op.") issued on December 23, 2003, by United States District Judge Michael P. Mills in that cause of action styled *Rain Bird Corporation v. National Pump Company, LLC; Robert Milton; and Gregory Salisbury,* Cause No. 2:01CV018–M–D, United States District Court for the Northern District of Mississippi. The "final judgement" entered in that lawsuit provides as follows:

Pursuant to the memorandum opinion issued this day, the court hereby finds for the plaintiff in the above-styled case and awards damages as follows:

1. $1,200,000.00 in actual damages, for which all defendants are jointly and severally liable;

2. $1,537,947.00 in actual damages for which Milton and NPC are jointly liable;

3. $131,220.00 in actual damages for which Milton is solely liable;

4. $94,256.00 in actual damages for which Salisbury is solely liable;

5. $5,000,000.00 in punitive damages for which NPC is solely liable; and

6. $500,000.00 in punitive damages for which Milton is solely liable.

It is also hereby ORDERED that NPC provide Rain Bird with the original production materials related to Rain Bird pump stations and to cause the Pump Monitor source code still in its counsel's possession to be deleted or destroyed.

Salisbury did not appeal the district court's judgment against him, and after the amounts awarded became final, Salisbury filed his answer in this adversary proceeding, denying that the judgment debts were non-dischargeable.

Rain Bird filed its motion for partial summary judgment contending that Salisbury is collaterally estopped from challenging or relitigating in this adversary proceeding the factual issues determined by the district court. In his response, Salisbury concurs that collateral estoppel is applicable, acknowledging that preclusive effect should be given to the district court's opinion. A brief comment on collateral estoppel is set forth as follows:

█ "[W]hen an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit." *RecoverEdge, L.P. v. Pentecost,* 44 F.3d 1284, 1290 (5th Cir. 1995) (quoting *Ashe v. Swenson,* 397 U.S. 436, 443, 90 S.Ct. 1189, 1194, 25 L.Ed.2d 469 (1970)).

█ In *Grogan v. Garner,* 498 U.S. 279, 284, n. 11, 111 S.Ct. 654, 658, n. 11, 112 L.Ed.2d 755 (1991), the United States Supreme Court held that collateral estoppel principals "apply in discharge exception proceedings pursuant to § 523(a)."

█ The Fifth Circuit has held that for collateral estoppel to apply, the following three requirements must be met, to-wit:

(1) The issue to be precluded must be identical to that involved in the prior

action; (2) in the prior action the issue must have been actually litigated; and (3) the determination made of the issue in the prior action must have been necessary to the resulting judgment. *Matter of Davis*, 3 F.3d 113, 114 (5th Cir. 1993) (citing *In re Schuler[Shuler]*, 722 F.3d[F.2d] 1253, 1256, n. 2 (5th Cir. 1984)[)].

Bringing unanimity to the applicability of collateral estoppel, this court agrees that preclusive effect should be given to the factual issues decided by the district court. Those issues will be discussed in more depth as they relate to each non-dischargeability claim.

### III.

*The Award Against Salisbury in the Amount of $1,200,000.00 for Tortious Interference with Contract, Tortious Interference with Business Relations, and Misappropriation of Trade Secrets*

■ Rain Bird asserted that Salisbury, along with the other defendants, tortiously interfered with confidentiality obligations that Golf Course Irrigation Services, Inc., ("GCIS"), had conveyed to Rain Bird through contracts that had been individually executed on behalf of GCIS by Salisbury and Milton. The factual underpinnings of these allegations center on confidential information about Rain Bird's products and prospective customers, in the possession of GCIS, which was disclosed by Milton and Salisbury to NPC. Rain Bird also contended that these disclosures constituted misappropriation of its trade secrets. Because the district court concluded that Salisbury participated in these acts, he was found to be jointly and severally liable with the other defendants for damages caused to Rain Bird in the sum of $1,200,000.00.

In the case of *Raspanti v. Keaty (Matter of Keaty)*, 397 F.3d 264 (5th Cir.2005), Chief Judge Carolyn King discussed the Fifth Circuit standard for maintaining a cause of action under § 523(a)(6) of the Bankruptcy Code, as follows:

Section 523(a)(6) of the Bankruptcy Code excepts from discharge any debt incurred for willful and malicious injury by the debtor to another entity. 11 U.S.C. § 523(a)(6)(2004). Section 523(a)(6) of the Bankruptcy Code specifically provides:

§ 523. Exceptions to discharge

(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt ...

(6) for willful and malicious injury by the debtor to another entity or to the property of another entity....

*Id.* The Supreme Court, in *Kawaauhau v. Geiger*, 523 U.S. 57, 61, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998), stated that "[t]he word 'willful' in (a)(6) modifies the word 'injury,' indicating that nondischargeability takes a deliberate or intentional *injury*, not merely a deliberate or intentional *act* that leads to injury." The Fifth Circuit extended *Kawaauhau's* reasoning in *Miller v. J.D. Abrams, Inc. (In re Miller)*, 156 F.3d 598, 603 (5th Cir.1998), and stated that "either objective substantial certainty [of injury] or subjective motive [to injure] meets the Supreme Court's definition of 'willful ... injury' in § 523(a)(6)." (third alteration in original). The court in *Miller* went on to define the word "malicious" and specifically rejected that it meant an act without just cause or excuse. *Id.* at 605. Instead, the court defined "malicious" as an act done with the actual intent to cause injury. *Id.* at 606. The court noted that this definition is synonymous with the definition of "willful" and thus

aggregated "willful and malicious" into a unitary concept. Thus, the court held that "an injury is 'willful and malicious' where there is either an objective substantial certainty of harm or a subjective motive to cause harm." *Id.* at 606; *see also Williams v. IBEW Local 520 (In re Williams)*, 337 F.3d 504, 509 (5th Cir. 2003).

397 F.3d at 269–70.

This court has applied the objective substantial certainty of harm standard in the case of *In re Smith*, 302 B.R. 530 (Bankr. N.D.Miss.2003), a proceeding involving the debtor's wrongful conversion of annuity payments which had been pledged to a creditor.

In its opinion, the district court set forth the requirements under Mississippi law to establish a claim of tortious interference with contract, to-wit:

> The four elements for this tort are: (1) That the acts were intentional and willful; (2) that they were calculated to cause damage to the plaintiffs in their lawful business; (3) that they were done with the unlawful purpose of causing damage and loss, without right or justifiable cause on the part of the defendant (which constitutes malice); and (4) that actual damage or loss resulted.

Mem. Op. at 28 (quoting *Par Industries, Inc. v. Target Container Company*, 708 So.2d at 44, 48 (Miss.1998)).

The opinion continues as follows:

> The element of willfulness and calculation does not require a showing on the part of the plaintiff that defendant had a specific intent to deprive plaintiff of contractual rights. Rather, the requisite intent is inferred when defendant knows of the existence of a contract and does a wrongful act without legal or social justification that he is certain or *substantial-*

*ly certain* will result in interference with the contract. (emphasis added)

Mem. Op. at 28 (quoting *Liston v. Home Insurance Company*, 659 F.Supp. 276, 281 (S.D.Miss.1986)) (citing *Cranford v. Shelton*, 378 So.2d at 652, 655 (Miss.1980)).

Again, Milton and Salisbury certainly knew of the confidentiality obligations, and NPC admittedly was aware of them as well after January 2, 2002. Furthermore, Milton and Salisbury made use of the information on behalf of NPC, which is therefore charged with the knowledge possessed by its agents Milton and Salisbury. The court finds that Milton, Salisbury and NPC all possessed knowledge of the obligation and took action which they were substantially certain would result in interference with the obligation. The Court finds that the intentional action was taken with the unlawful purpose of causing damage and loss, without regard or justifiable cause on the part of the defendants.

. . . .

Rain Bird also complains of the transfer to NPC of the production materials related to Rain Bird pump stations and necessary for efficient service of those pump stations. It is clear that this information, including the job notebooks, drawings, electrical schematics, bills of materials and vendor listing, come within the purview of the "designs, drawings, blueprints," and information regarding Rain Bird "products" protected by the confidentiality provisions, and it is undisputed that this information passed into the possession of NPC on January 2, 2002. The court finds that an enforceable obligation existed that this information would not be disclosed or transferred to NPC, and that the obligation would have been performed had the materials not been transferred to NPC. The Court finds that Milton, Salisbury

and NPC all possessed knowledge of the obligation and took action which they were substantially certain would result in interference with the obligation.

Mem. Op. at 34 and 35.

The "substantial certainty" standard for the level of intent required for a finding of tortious interference with a contract appears to be identical to the Fifth Circuit's "objective substantial certainty of harm" standard required for a finding of willful and malicious injury under § 523(a)(6) of the Bankruptcy Code.

The district court outlined the requirements under Mississippi law to establish a claim of tortious interference with business relations, to-wit:

"[T]he tortious interference with business relations occurs when a person unlawfully diverts prospective customers away from one's business." *Par Indus., Inc. v. Target Container Co.*, 708 So.2d 44, 48 (Miss.1998). The plaintiff must prove, by a preponderance of the evidence, the following elements: (1) the acts were willful and intentional; (2) the acts were calculated to bring about damage to the plaintiff's business; (3) the defendant's purpose to cause damage was neither right nor justifiable; and (4) actual damage and loss. *MBF Corp. v. Century Bus. Communications, Inc.*, 663 So.2d 595, 598 (Miss.1995).

Mem. Op. at 38.

Concerning this claim, the district court made the following factual findings and conclusions:

Rain Bird claims the defendants wrongfully diverted prospective customers away from Rain Bird for their own benefit. It is undisputed that after Milton informed Rain Bird that GCIS would no longer accept purchase orders from any customers, and that while Milton and NPC were negotiating for NPC to assume manufacturing operations using GCIS' assets and employees, GCIS continued to issue pump station quotes, including for prospective customers who had outstanding Rain Bird quotes. During its negotiations with Milton, NPC assumed, correctly, that Rain Bird had outstanding quotes to prospective customers, NPC knew that GCIS was continuing to issue its own quotes, and it was admittedly NPC's expectation that it would get some of that business. Indeed, as previously discussed herein above, after knowingly acquiring the confidential information regarding Rain Bird's prospective customers, NPC used that information to make quotes to many of those customers and in fact succeeded in making sales to several of them. Rain Bird, meanwhile, after NPC's lease of the GCIS assets secured by Rain Bird and NPC's assumption of operations at the GCIS facility, was left incapable of honoring its commitments to its prospective customers, most notably those who had actually ordered the Rain Bird product, including Mather Golf Course, for whom GCIS, after refusing further purchase orders from Rain Bird, issued its own quote, and for whom NPC ultimately performed and invoiced the installation. By their actions, the defendants simultaneously incapacitated Rain Bird's pump station prospects and diverted those prospects for the defendants' own benefit.

The Court finds that these acts by the defendants were willful, intentional and malicious, and that they were calculated to cause damage to Rain Bird's pump station business. That the acts were also calculated to benefit the defendants' own fledgling pump station business does not make the defendants' purpose right or justifiable, and the Court finds that it was not. The Court also finds that Rain Bird suffered actual damage

in lost sales to prospective customers, including prospective customers who had actually ordered Rain Bird pump stations, as well as, prospective customers to whom NPC made sales using confidential information acquired from GCIS, resulting in unjust enrichment for NPC. The monetary amount of this loss suffered by Rain Bird is necessarily included in its lost future profits from pump station sales previously discussed herein above. The Court finds that Rain Bird's inability to honor its prospective customer quotes and purchase orders also caused damage to Rain Bird's reputation in the marketplace.

Mem. Op. at 38, 39, and 40.

The district court then addressed the elements under Mississippi law to establish the tort of misappropriation of trade secrets:

This cause of action entails a showing of the following elements: (1) a trade secret existed; (2) the trade secret was acquired through breach of a confidential relationship or discovered by improper means; and (3) the use of the trade secret was without the plaintiff's authorization. *Union National Life Insurance Company v. Tillman*, 143 F.Supp.2d 638, 643 (N.D.Miss.2000).

Mem. Op. at 40.

The court analyzed each of the aforementioned elements and concluded that Rain Bird had established its claim for misappropriation against each of the defendants.

Mem. Op. at 43.

In discussing its award of punitive damages against Milton and NPC, the district court reiterated that it had concluded that all of the defendants' conduct (including Salisbury's) was malicious insofar as the tort of interfering with the obligations to keep Rain Bird's proprietary information confidential.

Mem. Op. at 39 and 44.

From the above discussion, it is clear to this court that the district court concluded that Salisbury had intentionally taken action with the unlawful purpose of causing damage and loss to Rain Bird concerning the disclosure of prospective customer information, as well as, the disclosure of materials related to Rain Bird products. These disclosures were substantially certain to result in interference with the confidentiality obligations owed to Rain Bird. Since the parties hereto have agreed that collateral estoppel is applicable to this adversary proceeding, this court concludes that the findings of the district court conclusively establish that Salisbury's actions were willful and malicious as contemplated by § 523(a)(6) of the Bankruptcy Code. As such, the assessment of damages against him in the sum of $1,200,000.00, as a joint and several obligation, is non-dischargeable in his bankruptcy case.

■ This court reaches this conclusion by analyzing the clear and unambiguous language set forth by Judge Mills in his opinion. This court is certainly cognizant of the fact that punitive damages were not assessed against Salisbury, but this determination is not controlling as to whether Salisbury's actions were "willful and malicious" as required by § 523(a)(6). *See, In re Miller*, 156 F.3d 598 at 603, which specifically held that this was a question of federal law, not state law.

IV.

*The Damages Awarded Against Salisbury in the Amounts of $89,256.00 and $5,000.00 Related to Salisbury's Breaches of Fiduciary Duty*

■ Salisbury and Milton, on behalf of GCIS, executed confidentiality agreements

690

with Rain Bird as a part of their business venture to supply Rain Bird with irrigation pump stations and accessory products. In addition, GCIS borrowed $1,500,000.00 from Rain Bird which was secured by a second lien on all GCIS assets. Rain Bird's lien was subordinate, however, to the lien of InSouth Bank. The loan was individually guaranteed by Salisbury and Milton, and the loan agreement provided that GCIS would not dispose of any of its assets except in the ordinary course of business. As additional security, Salisbury and Milton pledged their shares of stock in GCIS to Rain Bird.

After these agreements were "in place," Salisbury and Milton began their course of business "dealings" with NPC. As set forth in detail in the district court's opinion and as discussed hereinabove, these "dealings" resulted in the tortious interference with Rain Bird's contract with GCIS, the tortious interference with Rain Bird's business relations with its customers, and the misappropriation of Rain Bird's trade secrets.

On October 24, 2001, "in spite of mounting financial difficulties," Milton and Salisbury resigned their positions with GCIS, and disbursed to themselves sizeable severance packages. (Milton received $126,220.00 and Salisbury received $89,256.00.) Rain Bird was not notified of these disbursements, contrary to the loan documentation, nor was the first lien holder, InSouth Bank.

On December 5, 2001, Milton and Salisbury formed Golf Course Irrigation *Systems*, Inc., then immediately changed the corporate name to Packaged Pumping Solutions, Inc., ("PPS"). Without advising Rain Bird, they transferred assets from GCIS to PPS, then sold these assets, also without notice, making profits of $5,000.00 each. Salisbury acknowledged in his testimony that he knew that the assets transferred to PPS were encumbered by the Rain Bird security agreements. Mem. Op. at 10.

Shortly thereafter, GCIS leased its plant facilities to NPC. While the lease agreement was negotiated exclusively by Milton, Salisbury voted to enter into this transaction which stripped GCIS of practically all of its remaining assets.

As set forth in the following comment, the district court concluded that Salisbury and Milton occupied a fiduciary relationship to Rain Bird under Mississippi law, to-wit:

A corporate director or officer owes a fiduciary duty to the corporation's creditors as well, and he may not use his position to benefit himself at their expense. *Cooper v. Mississippi Land Company*, 220 So.2d 302, 307 (Miss. 1969). "As such, an officer or director must act in accordance with the best interests of the corporation and by the strict standards of rectitude that bind a fiduciary; he is not entitled to use his position for personal gain where harm will befall the corporation, *its creditors*, or stockholders." *Home Telephone Company v. Darley*, 355 F.Supp. 992, 999 (N.D.Miss.1973) (emphasis added).

Furthermore, a director or officer who is a pledgor of corporate stock, and who is in effective control of the corporation, owes a fiduciary duty to the pledgee of the stock. *Gibson v. Manuel*, 534 So.2d 199, 202–03 (Miss.1988). The reason is that "[a] pledgee holding a security interest in corporate shares is a potential shareholder. He has the same interest and concern as a shareholder that the corporate affairs be managed properly. If the officers default, the pledgee suffers harm not unlike that experienced by the shareholder." *Gibson*, 534 So.2d at 202. "The content and particulars are the same as those duties an officer or

director owes to shareholders." *Id.* at 203.

Mem. Op. at 47.

In the instant case, it is undisputed that Milton and Salisbury were officers and directors of GCIS, and that after resigning as officers, they remained as directors. It is also undisputed that Rain Bird was a secured creditor of GCIS in the amount of $1.5 million. It is further undisputed that Milton and Salisbury were pledgors of GCIS stock, that Milton, at least, was at all relevant times in effective control of GCIS, and that Rain Bird was the pledgee of all the GCIS stock. Therefore, the Court finds by clear and convincing evidence that Milton and Salisbury, as GCIS directors, and Milton, as a pledgor of corporate stock who was in effective control of the corporation, owed a fiduciary duty to Rain Bird as a creditor of GCIS and as a pledgee of GCIS stock. As such, Milton and Salisbury owed a duty to refrain from taking actions for their own benefit where harm would befall Rain Bird, and NPC is liable as well if it knowingly participated or assisted Milton or Salisbury in any breaches of their fiduciary duty.

Mem. Op. at 48.

A corporate fiduciary "is not entitled to profits beyond the earnings of his stock, a proper compensation and expenses." *Knox Glass Bottle Company [v. Underwood]*, 89 So.2d [799] at 815 [(Miss.1956)] (quoting Fletcher, Corporations, Sec. 884 (1947)). It is undisputed that the severance packages were not disclosed to Rain Bird. Given GCIS' admittedly dire financial situation, the Court finds that the $215,476 in severance, based upon Milton's wife's severance from an international pharmaceutical corporation traded on the New York Stock Exchange, does not qualify as

proper compensation for which the corporation received full and adequate compensation. No doubt the interests of GCIS and Rain Bird would have been better served had that money been used for business operations or to pay down GCIS' secured debts.

Mem. Op. at 49 and 50.

The district court concluded that the severance packages taken by Milton and Salisbury for their own personal profit was damaging to the interest of Rain Bird as the pledgee of all of the corporate stock of GCIS, as well as, as a $1,500,000.00 creditor of GCIS. In this context, the court concluded that the withdrawals adversely affected the value of the GCIS stock.

The district court reached the identical conclusion concerning the $5,000.00 profit that Salisbury and Milton each improperly earned as a result of the wrongful transfer of assets from GCIS to PPS. Mem. Op. at 50 and 51.

█ In *Gupta v. Eastern Idaho Tumor Institute, Inc., (Matter of Gupta)*, 394 F.3d 347 (5th Cir.2004), Judge Edith Jones explained that for dischargeability purposes, whether a debtor stood in a fiduciary capacity to a creditor was a question of federal law. Her analysis is set forth as follows, to-wit:

A bankruptcy court may apply **collateral estoppel** in a dischargeability proceeding to preclude relitigation of state court findings that are relevant to dischargeability. *See Schwager v. Fallas (In re Schwager)*, 121 F.3d 177, 181 (5th Cir.1977[1997]) (citing *Grogan v. Garner*, 498 U.S. 279, 285 n. 11, 111 S.Ct. 654, 658 n. 11, 112 L.Ed.2d 755 (1991)). The ultimate determination of dischargeability is, however, a federal question. As we have elaborated, "The scope of the concept of fiduciary under 11 U.S.C. § 523(a)(4) is a question of

federal law; however, state law is important in determining whether or not a trust obligation exists." *LSP Inv. Partnershp v. Bennett (In re Bennett)*, 989 F.2d 779, 784 (5th Cir.1993) (relying on *Angelle v. Reed (In re Angelle)*, 610 F.2d 1335, 1335–41 (5th Cir.1980)). The problem in this case is how to interpret the jury's finding of a breach of fiduciary duty in light of Texas partnership law and this circuit's interpretation of the federal standard.

Bankruptcy law has consistently rendered non-dischargeable debts that arise from "fraud or defalcation while acting in a fiduciary capacity. . . ." 11 U.S.C. § 523(a)(4). Justice Cardozo explained a predecessor provision as follows:

It is not enough that by the very act of wrongdoing out of which the contested debt arose, the bankrupt has become chargeable as a trustee *ex maleficio.* He must have been a trustee before the wrong and without reference thereto. *Davis v. Aetna Accept. Co.*, 293 U.S. 328, 333, 55 S.Ct. 151, 154, 79 L.Ed. 393 (1934). *Davis* goes on to hold that a debtor was not a trustee "in that strict and narrow sense" *id.*, when he allegedly converted property subject to the creditor's security interest. Implementing *Davis*, this court has held that a trust relationship imposed by Louisiana statute on the dealings between a homebuilder and his customers was, on the facts presented, insufficient to establish a non-dischargeable breach of fiduciary duty. *Angelle*, 610 F.2d at 1335–41. The court emphasized that a trust must exist "prior to the wrong and without reference to it," *id.* at 1340. in order to constitute a "technical trust" within the non-dischargeability provision. [FN3] This court has, on the other hand, not hesitated to conclude that debts arising from misappropriation by persons serving in a traditional, pre-existing fiducia-

ry capacity, as understood by state law principles, are non-dischargeable. Thus, debts of corporate officers to the corporation or a minority shareholder have been held non-dischargeable, as have the debts of a managing partner of a limited partnership to the limited partners. *Moreno v. Ashworth (In re Moreno)*, 892 F.2d 417, 421 (5th Cir.1990); *Bennett*, 989 F.2d at 791; *Sheerin v. Davis (In re Davis)*, 3 F.3d 113, 117 (5th Cir. 1993).

394 F.3d at 349–50.

Applying federal law to the factual and legal conclusions reached by the district court, Salisbury stood in a fiduciary position to Rain Bird prior to the alleged wrongful acts and without reference to those acts.

■ In *Moreno v. Ashworth (Matter of Moreno)*, 892 F.2d 417 (5th Cir.1990), another opinion authored by Judge Jones, the Fifth Circuit articulated a definition of "defalcation" as follows:

A defalcation is a willful neglect of duty, even if not accompanied by fraud or embezzlement. *See* L. King, 3 Collier on Bankruptcy ¶ 523.14 at 523–93 to 523–95 (15th ed.1988), quoting *Central Hanover Bank & Trust Co. v. Herbst*, 93 F.2d 510 (2d Cir.1937) (L.Hand, J.). Moreno does not dispute that he owed a fiduciary duty to PEEC because he was an officer. This duty encompassed, at least, a responsibility not to lend PEEC's money to himself or corporations controlled by him on less than an arms-length basis. *See generally Gearhard[Gearhart] Industries, Inc. v. Smith International, Inc.*, 741 F.2d 707, 719 (5th Cir.1984). *See also International Bankers Life Ins. Co. v. Holloway*, 368 S.W.2d 567 (Tex.1963).

892 F.2d at 421.

■ Although the district court did not use the word "defalcation" in its opinion,

this court concludes that Salisbury's conduct falls squarely within the definition set forth in *Moreno.*

Consequently, the $89,256.00 severance package wrongfully taken by Salisbury, as well as, the $5,000.00 profit that he earned by wrongfully participating in the transfer of assets from GCIS to PPS are non-dischargeable debts pursuant to § 523(a)(4) of the Bankruptcy Code.

■ Although it was not addressed in the motion for partial summary judgment, the actions by Salisbury in wrongfully taking the severance package and profiting by improperly disposing of GCIS' assets to the detriment of Rain Bird's interest in the GCIS corporate stock, would, as a matter of law, constitute willful and malicious conduct consistent with the objective substantial certainty of harm standard recognized by the Fifth Circuit. Salisbury's participation in these transactions amounts to a wrongful conversion of assets.

## V.

### *Conclusion*

Consequently, this court determines that the following debts are non-dischargeable in Salisbury's bankruptcy case, to-wit:

(a) $1,200,000.00, the damages awarded because of Salisbury's tortious interference with Rain Bird's contract with GCIS, the tortious interference with Rain Bird's business relations with its customers, and the misappropriation of Rain Bird's trade secrets pursuant to § 523(a)(6) of the Bankruptcy Code.

(b) $89,256.00, the damages awarded because of Salisbury's wrongful taking of the severance package which amounts to a defalcation while acting in a fiduciary capacity pursuant to § 523(a)(4) of the Bankruptcy Code.

(c) $5,000.00, the damages awarded because of Salisbury's wrongful profiting from the transfer of assets to PPS which amounts to a defalcation while acting in a fiduciary capacity pursuant to § 523(a)(4) of the Bankruptcy Code.

(d) Alternatively, the sums of $89,256.00 and $5,000.00 are non-dischargeable debts as willful and malicious injuries pursuant to § 523(a)(6) of the Bankruptcy Code because of Salisbury's wrongful conversion of assets.

A separate judgment will be entered consistent with this opinion.